UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY K. LEDFORD,

     Plaintiff                             Civil Action No. 16-12096

v.

COMMISSIONER OF SOCIAL           HON. R. STEVEN WHALEN
SECURITY,                            U.S. Magistrate Judge

     Defendant.

_____/

## OPINION AND ORDER

Plaintiff Kimberly K. Ledford ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the reasons discussed below, Defendant's Motion for Summary Judgment [Docket #18] is GRANTED and Plaintiff's Motion for Summary Judgment [Docket #12] is DENIED.

## I. PROCEDURAL HISTORY

On April 3, 2013, Plaintiff filed an application for DIB alleging disability as of July 4, 2012 (Tr. 121-127). After the initial denial of the claim, Plaintiff requested an administrative hearing, held on August 1, 2014 before Administrative Law Judge ("ALJ") Jerome Blum (Tr. 32). Plaintiff, represented by attorney Heidi G. Walkon, testified (Tr. 34-50), as did Vocational Expert ("VE") Cheryl Mosley (Tr. 50-56). On September 15, 2014, ALJ Blum found that Plaintiff was not disabled (Tr. 14-27). On May 5, 2016, the Appeals Council denied review (Tr. 1-5). Plaintiff filed for judicial review of the final decision in this Court on June 8, 2016. *Docket #1*.

## II. BACKGROUND FACTS

Plaintiff, born April 9, 1960, was 54 when ALJ Blum issued his decision (Tr. 27, 121). She completed 11th grade and received training as a bartender (Tr. 151). She worked as the manager of a grocery store between 1992 and 2011 (Tr. 151). She alleges disability resulting from brain damage, a heart attack, neuropathy, ecoli, and liver and kidney failure (Tr. 150).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

She was hospitalized in July, 2012, during which time she required the use of a ventilator (Tr. 35). She also experienced a heart attack and stroke (Tr. 35). At the time of the hearing, she experienced lower leg, foot, and hand neuropathy (Tr. 35). The conditions were brought on by a combination of alcohol and "a really bad urinary tract infection" (Tr. 35). She worked as a grocery store manager for 19 years before the store was sold (Tr. 35). After losing her job, she became depressed and began drinking excessively (Tr. 36). She stopped drinking at the time of her July, 2012 hospitalization, but continued to smoke a half pack of cigarettes each day (Tr. 36, 38).

Plaintiff attended physical therapy twice a week to reduce the foot numbness (Tr. 39). She took Neurontin for the foot numbness, Hydrocodone for pain, and antidepressive medication (Tr. 39-40). Her most comfortable position was lying down (Tr. 40). She experienced foot pain while sitting (Tr. 41). She was unable to sit, stand, or walk for more than 30 minutes without requiring a change of position (Tr. 41).

She lived in a ranch house but was unable to use the basement stairs (Tr. 41). She relied on either her husband or children to cook, do laundry, and clean (Tr. 42). She experienced the medication side effects of dry mouth, fatigue, and dizziness (Tr. 43). She

experienced memory problems (Tr. 43). Before July, 2012 she used a computer rarely and since the hospitalization, had never used a computer (Tr. 43). She would be unable to return to her former job due to her inability to perform the walking requirements and her inability to use a cash register (Tr. 44). As a result of hand problems, she experienced difficulty opening jars and other fine manipulative activities (Tr. 45). She had been diagnosed with moderate neuropathy and moderate Carpal Tunnel Syndrome ("CTS") (Tr. 45). Her symptoms of neuropathy and CTS waxed and waned (Tr. 46). She experienced "bad days" around two days a week at which time she spent most of the day in bed (Tr. 46).

Plaintiff had medical insurance and treated with a neurologist once a month (Tr. 46). She received electromagnetic and massage treatment (Tr. 46). The neuropathy was the result of excessive alcohol use (Tr. 48).

### B. Medical Evidence

### 1. Records Related to Plaintiff's Treatment

August, 2012 discharge records by St. John Macomb Hospital state that Plaintiff sought emergency treatment on July 8, 2012 for jaundice, abdominal pain, mental status changes, nausea, and a history of alcohol abuse with "possible liver cirrhosis," and "acute alcoholic poisoning" (Tr. 176, 180, 208-209, 213). She also exhibited symptoms of alcohol withdrawal syndrome including "agitation and paranoia" (Tr. 176, 206). She was diagnosed with a heart attack, anemia, reflux esophagitis, and a urinary tract infection ("UTI") (Tr. 176, 201). She admitted that before her hospitalization, she drank a fifth of vodka every day (Tr. 203). After being admitted, she developed respiratory failure requiring the use of a ventilator (Tr. 176, 229). A CT of the brain was unremarkable (Tr. 221). Imaging studies of the kidneys were unremarkable (Tr. 243).

In September, 2012, neurologist Haranath Policherla, M.D. performed an initial evaluation of Plaintiff, noting her reports of dizziness, coordination problems, right foot pain, left upper extremity pain, snoring, concentrational problems, and depression (Tr. 297). She admitted that she continued to smoke (Tr. 298). Dr. Policherla observed a cervical tremor and the inability to heel and toe walk (Tr. 298). He noted full strength in the upper extremities (Tr. 298). He noted possible alcohol-related mild dementia, alcoholic neuropathy, daytime somnolence due to sleep apnea, and mild amnesic syndrome (Tr. 299). The same month, internist Radha Paruchuri, M.D. noted Plaintiff's report of normal sleep patterns but fatigue (Tr. 311). Plaintiff denied dizziness (Tr. 311). She reported numbness of the tip of her toes (Tr. 312).

An October, MRI of the brain showed "minimal" chronic small vessel disease (Tr. 245). Clinical testing from the same month showed obstructive sleep apnea syndrome (Tr. 266). Dr. Policherla found the presence of mild alcoholic dementia, bilateral hand numbness, dizziness, and CTS (Tr. 261). He noted full motor strength in the upper extremities (Tr. 258). In November, 2012 Dr. Policherla noted coherent speech and full orientation (Tr. 256). She exhibited full strength in the upper extremities but limited strength in the right lower extremity (Tr. 256). A sensory examination was unremarkable (Tr. 256). Plaintiff reported that she wore bilateral wrist splints at night for CTS (Tr. 257).

In January, 2013, Dr. Policherla noted full muscle strength in all extremities (Tr. 254). He noted Plaintiff's report of "stabbing" foot pain (Tr. 255). Plaintiff denied problems with CTS but reported that she still wore wrist splints at night (Tr. 255). She appeared "awake, alert, attentive, and oriented x3" (Tr. 254). The following month, Dr. Policherla noted that the neuropathic symptoms were under control (Tr. 252). Plaintiff appeared alert with coherent speech (Tr. 252). She declined a recommendation for "physical therapy with wax

treatments" for CTS (Tr. 253).  The following month, she appeared alert with a normal gait but difficulty with bilateral hand strength (Tr. 250).  She reported that the neuropathy was "much better" with Neurontin and Norco (Tr. 251).  The same month, Dr. Paruchuri noted Plaintiff's report that her mood was "much better now" and that she was taking care of her father who had been diagnosed with cancer (Tr. 322).  She exhibited normal muscle strength (Tr. 323).

In April, 2013, Plaintiff exhibited a normal gait and reported that the neuropathic symptoms were under control with only "occasional numbness and tingling in the hands" (Tr. 249).  Dr Policherla's records from June, 2013 note continued numbness and tingling of the hands (Tr. 352).  In July, 2013, Plaintiff declined recommendations for carpal tunnel release for moderate right CTS (Tr. 348).

Dr. Policherla's November, 2013 records show full orientation with full strength in the upper and lower extremities (Tr. 343).  The same month, Dr. Policherla completed an assessment of Plaintiff's abilities, finding that she was limited to lifting less than five pounds (Tr. 307).  He declined to find specific limitations in manipulative functioning or walking, standing, or sitting (Tr. 308).  He found that Plaintiff was precluded from all postural activities except for the ability to "look down" on a rare basis (Tr. 309).  He found that her symptoms would interfere with her work on a "frequent" basis (Tr. 309).  The same month, Archi Trivedi, M.D. observed that Plaintiff was in no acute distress (Tr. 327).  She exhibited full strength in all extremities, a normal gait, and was fully oriented (Tr. 329).  A March, 2014 EMG showed only mild CTS (Tr. 336).

In June, 2014, Physical Therapist Adria Podlewski, MPT, summarized Plaintiff's condition, noting Plaintiff's report of level "four" pain on a one to ten scale (Tr. 362).  She reported "some improvement" with physical therapy (Tr. 362).  Plaintiff reported that on

"bad" days she was limited to walking indoors (Tr. 362). Podlewski stated that Plaintiff could sit up to one hour, stand for 15 minutes, and walk for up to 45 minutes (Tr. 363). Plaintiff reported that she could lift up to 15 pounds (Tr. 363). She demonstrate 3/5 lower extremity strength (Tr. 363).

## 2. Consultative and Non-Examining Sources

In May, 2013, M. Dibai, M.D. performed a consultative psychiatric evaluation on behalf of the SSA, noting Plaintiff's report of lack of balance, neuropathy of the feet, and CTS (Tr. 300). Plaintiff denied psychiatric treatment and reported that she did not experience medication side effects (Tr. 300). She reported that she grocery shopped, went out to dinner with her current husband, and drove short distances (Tr. 301). Dr. Dibai noted that she "appeared preoccupied with somatic complaints" and "amotivational to seek employment" (Tr. 302). She exhibited a well organized thought process and was fully oriented (Tr. 302). She was able to perform calculations without problems and did not exhibit short term memory problems (Tr. 303). Dr. Dibai noted that she appeared "visibly depressed, tearful, and hopeless" (Tr. 303).

In June, 2013, Daniel Blake, Ph.D. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that Plaintiff experienced mild restriction in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 63-64). The same month, Muhammad Ahmed, M.D. performed a non-examining review of the records pertaining to Plaintiff's physical conditions, finding that she could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 65). Dr. Ahmed found that she was limited to occasionally postural activity but did not experience manipulative, visual, or communicative limitations (Tr. 66). He found that Plaintiff should

avoid concentrated exposure to airborne hazards, machinery, and heights (Tr. 66).

### C.   Vocational Expert Testimony

VE Cheryl Mosley classified Plaintiff's former work as a grocery store manager as skilled and exertionally light as customarily performed in the national economy (exertionally medium as described by Plaintiff)[1] (Tr. 50-51). VE Mosley found Plaintiff posessed transferrable skills to the occupation of telephone solicitor (1,200 positions in the regional economy (Tr. 52). However, if Plaintiff's claim that she needed to recline periodically were credited, the VE found that the job would be unavailable (Tr. 53). The VE stated that if the alleged dizziness and balance problems took Plaintiff off task for more than 20 percent of the work shift, the job would be precluded (Tr. 54). She stated further that if Plaintiff were limited to occasional manipulative activity, or, did not understand how to use a computer, the job would be precluded (Tr. 54).

### D.  The ALJ's Decision

Citing the medical transcript, ALJ Blum found that Plaintiff experienced the severe impairment of "obstructive sleep apnea; mild sensory neuropathy; left moderate peroneal neuropathy at the knee; and mild chronic small vessel disease" but that none of the conditions met or medically equaled an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 16, 19). He found that the conditions of CTS, depression, and alcohol abuse were non-severe (Tr. 17). The ALJ determined that Plaintiff experienced only mild psychological

---

[1]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work " lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

limitation (Tr. 17-18). The ALJ found that she retained the Residual Functional Capacity ("RFC") for a full range of sedentary work (Tr. 20).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform her past relevant work as a grocery store manager, she could perform the job of telephone solicitor (Tr. 26).

The ALJ discounted Plaintiff allegations of disability, citing Dr. Policheria's observation of 5/5 strength in all extremities as of February, 2013 (Tr. 21-22). The ALJ noted that Plaintiff exhibited a normal gait, sensation, and coordination as of March, 2013 (Tr. 22). The ALJ noted that while October, 2012 records showed "mild cognitive dysfunction secondary to alcohol dementia," as of May, 2013, Plaintiff "exhibited excellent calculations" and was able to drive and use a computer (Tr. 23). The ALJ cited Dr. Policheria's May, 2014 records noting that she was "doing well" regarding the sleep apnea and did not display deficits in memory or concentration (Tr. 23).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

Plaintiff makes three arguments for remand, contenting first that the ALJ erred by finding that the conditions of CTS and depression did not create significant work-related limitation. Next, she disputes the finding that her allegations of physical and cognitive impairment were not credible. Finally, she contends that the ALJ failed to sustain his Step

Five burden to establish that she was capable of performing the work of a telephone solicitor.

## A. The Step Two Findings

Plaintiff contends that the ALJ erred at Step Two of the sequential analysis by finding that the conditions of CTS and depression were non-severe. *Plaintiff's Brief,* 10-14 (*citing* Tr. 17), *Docket #12,* Pg ID 414. She argues, in effect, that her significant manipulative limitations resulting from CTS stand at odds with the finding that she was capable of a full range of sedentary work. *Id.* (*citing* Tr. 17-20, 26). Likewise, she disputes the ALJ's finding that the condition of depression was non-severe, arguing that her mental health problems preclude the semiskilled work of a telephone solicitor. *Id.* (*citing* Tr. 26).

At Step Two, "impairment or combination of impairments ... found 'not severe' and a finding of 'not disabled' is made ... when medical evidence establishes only a slight abnormality or [] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856,*3 (1985). "In the Sixth Circuit, the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. February 22, 2008)(*citing Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1998)). "The goal of the test is to 'screen out totally groundless claims.' " *Id.* (*citing Farris v. Secretary of Health & Human Services*, 773 F.2d 85, 89 (6th Cir. 1985)).

As a preliminary matter, the Court acknowledges that the hospital records from July and August, 2012 show that for a time, Plaintiff was unable to perform any gainful employment. However, under SSA law, to establish disability, the claimant must show that the "inability to engage in any substantial gainful activity . . . which has lasted or can be expected to last *for a continuous period of not less than 12 months*." 42 U.S.C. §423(d)(1)(A)(emphasis added).

The ALJ's finding that the conditions of CTS and depression did not cause significant work-related limitations for a period of 12 months or more is supported by substantial evidence. As to CTS, the ALJ noted that Plaintiff consistently exhibited 5/5 strength in the upper extremities (Tr. 16). He cited the October, 2012 nerve conduction studies showing "mild" CTS and January, 2013 treating records noting Plaintiff's denial of problems related to the condition (Tr. 16-17). He observed that although Plaintiff testified that she had access to medical coverage through her husband, she declined a recommendation for physical therapy for CTS in February, 2013 (Tr. 17). The ALJ cited Plaintiff's May, 2013 report to Dr. Dibai that she was able to grocery shop, dine out, do computer work, and drive (Tr. 17).

The ALJ's finding that the condition of CTS did not cause more than minimal work-related limitations is consistent with my own review of the transcript. March, 2013 records indicate that she was able to help care for her father following his cancer diagnosis (Tr. 322). Other portions of the record showing that she engaged in a wide range of activities including housework, grocery shopping, and driving (Tr. 301). In November, 2013 Dr. Policherla declined to find any manipulative limitations despite the diagnosis of CTS (Tr. 307-308).

The ALJ's finding that the psychological limitations were non-severe is also well supported by the record. He noted that Plaintiff's "calculations were excellent" and that she exhibited intact memory and judgment at the May, 2013 consultative examination by Dr. Dibai (Tr. 18). While Plaintiff points out that Dr. Dibai assigned her a GAF score of 32 (reflecting severe psychological limitation), the score does not equate with a disability finding.[2] "[W]hile GAF scores may be evidence of serious symptoms, '[t]hey are subjective

---

[2]

A GAF score of 31 to 40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders–Text*

opinions, representing a snapshot of a person's level of functioning at a given moment in time, not a rating of their ability to work.' " *Sessor v CSS*, 2012 WL 4369071,*7 (E.D. Mich September 25, 2012)(*citing Jordan v. CSS*, 2011 WL 891198, *5 (E.D. Mich. January 14, 2011)).

To be sure, the July and August, 2012 hospital records document symptoms of alcohol withdrawal and cognitive limitations. In September, 2012 Dr. Policherla noted possible alcohol-related mild dementia and Plaintiff's report of depression (Tr. 297, 299). However, Dr. Policherla's subsequent records from November, 2012 forward state consistently that Plaintiff exhibited an unremarkable mood and normal cognitive abilities (Tr. 250, 252, 254, 256). The March, 2013 records note Plaintiff's report that her mood was "much better now" (Tr. 322). Dr. Dibai's finding that Plaintiff did not experience any cognitive/concentrational limitation also supports the ALJ's finding that the mental limitations were non-severe (Tr. 302).

### B. Plaintiff's Allegations of Limitation

For overlapping reasons, the ALJ did not err in declining to credit Plaintiff's allegations of disabling limitation. While "subjective complaints of a claimant can support a claim for disability[] if there is also evidence of an underlying medical condition in the record," the ALJ may reject a claimant's professed degree of limitation, provided the conclusions are supported by substantial evidence. *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).

Plaintiff faults the ALJ for finding that the memory problems resolved after she was treated for sleep apnea, disputing the ALJ's finding that sleep apnea "was the cause factor

---

*Revision* ("*DSM–IV–TR*"), 34.

regarding complaints of memory problems" (Tr. 25).  Plaintiff claims that "[n]owhere in the medical records is there any reference whatsoever to any relationship between sleep apnea and . . . impaired memory."  *Plaintiff's Brief* at 14.  However, the ALJ's conclusion is supported by Dr. Policheria's October, 2012 finding that sleep apnea, at a minimum, contributed to the memory problems (Tr. 259).

Plaintiff also faults the ALJ's citation to Dr. Dibai's consultative findings to support the conclusion that she could perform semiskilled work, noting that Dr. Dibai assigned her a GAF of 32.  *Id.* at 15.  She also cites Dr. Dibai's reference to her "debilitating medical conditions," arguing that the consultative examiner's findings, as a whole, point to a disability finding (Tr. 303).  However, this argument fails for multiple reasons.  First, Dr. Dibai, a psychiatrist, performed an evaluation of her *mental* limitations.  He did not perform a physical examination and his reference to the physical limitations is based on Plaintiff's allegations.  Second, the GAF of 32 is based largely on Plaintiff's professed degree of physical limitation and factors unrelated to the question of disability.   For example, in assigning the low GAF, Dr. Dibai considered her "loss of employment" and "long history of resorting [to] alcohol," although neither condition was relevant to question of whether she was psychologically capable of semiskilled work (Tr. 303). Finally, Dr. Dibai's observation that Plaintiff was "amotivational to seek employment" supports the finding that she was unwilling, rather than unable to return to work, and as a whole undermines her allegations of disability level impairment (Tr. 302).

Accordingly, the ALJ did not err in concluding that Plaintiff's allegations of limitation were not wholly credible.

### C.  The Step Five Determination

For the same reasons, Plaintiff's argument that the hypothetical question to the VE

errantly excluded "bilateral hand issues, memory impairment, and pain" does not provide grounds for remand. *Plaintiff's Brief* at 15-16. The ALJ's partial rejection of Plaintiff's professed limitations is well explained and supported by the treating records and imaging studies. As of February, 2013, Plaintiff exhibited a normal gait and in March, 2013, stated that the neuropathy was "much better" (Tr. 251). Again, while Plaintiff experienced significant limitations in the two months following the alleged onset of disability date of July 4, 2012, substantial evidence supports the finding that she did not experience disability level limitation one year later. Because the ALJ's rejection of Plaintiff's allegations was well supported and explained, he was not required to include discredited limitations in his query to the VE. *See Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir.1994)(ALJ not obliged to credit rejected claims in question to VE).

In closing, my recommendation to uphold the Commissioner's decision should not be read to trivialize Plaintiff's limitations, and it is of no import that I might find differently if this were *de novo* review. However, because the ALJ's decision was within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen, supra*.

## CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment [Docket #18] is GRANTED and Plaintiff's Motion for Summary Judgment [Docket #12] is DENIED.

IT IS SO ORDERED.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: September 21, 2017

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on September 21, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen